**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BENJAMIN GONZALES,

        Petitioner,

  v.

JAMES WALKER, Warden, California State
Prison – Sacramento,

        Respondent.

_____/

No. 02-02279 JSW

**ORDER DENYING PETITION
FOR A WRIT OF HABEAS
CORPUS**

**INTRODUCTION**

    Before this Court is the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, filed by Benjamin Gonzales ("Gonzales") challenging Gonzales' conviction. The Court has considered the parties' papers, relevant legal authority, and the record in this case. For the reasons set forth in the remainder of this Order, the petition is DENIED.

**PROCEDURAL BACKGROUND**

    On December 10, 1998, Gonzales was convicted by a jury of first degree murder, with personal use of a deadly or dangerous weapon, assault with a deadly weapon, and misdemeanor battery. Cal. Penal Code §§ 187, 12022(b), 245(a)(1), 243(d). He appealed the conviction on several grounds.

    The California Court of Appeal, First Appellate District affirmed Gonzales' conviction. The Supreme Court of California denied Gonzales' petition for review without opinion on February 21, 2001. Gonzales did not petition the United States Supreme Court for review.

On May 10, 2002 Gonzales filed a pro se petition for a writ of habeas corpus in this Court. (Docket ("Doc.") No. 1.) Gonzales then filed for leave to exhaust his available state remedies. (Doc. No. 15.) This Court granted leave on May 15, 2003 and after a continuance granted on April 11, 2006, Gonzales filed a pro se habeas petition in the California Supreme Court which was denied without opinion on September 27, 2006.

On October 27, 2006, court-appointed counsel filed a motion to amend Gonzales' initial pro se federal habeas petition alleging ten total claims of error in Gonzales' initial trial. (Doc. No. 98.) The State challenged several of the amended claims as untimely. (Doc. No. 107.) Gonzales alleged that all the claims related back. (Doc. No. 108 at 3.) Gonzales also requested "that if appropriate, he be permitted to raise the issue of equitable tolling of the statute of limitations due to his mental incompetence after the state court has ruled on the issue of his mental competence" in a separate but related trial before the Los Angeles County Superior Court ("Los Angeles Proceeding"). (*Id.* at 16.) The Court granted the request and stayed ultimate decision on whether to allow amendment pending resolution of claims that Gonzales may have been incompetent to stand trial in the separate proceeding and pending Gonzales' subsequent motion raising the issue of equitable tolling. (Doc. No. 115 at 13.)

On October 16, 2007, Gonzales' counsel notified this Court that Gonzales had pled guilty in the Los Angeles Proceeding, and agreed as a part of that plea to withdraw this petition. (Doc. No. 118 at 3.) On November 14, 2007, the Los Angeles County Superior Court sentenced Gonzales to life without the possibility of parole after he unsuccessfully sought to withdraw his guilty plea for lack of competency.[1] (*Id.*)

On March 27, 2008, Gonzales' counsel filed a status report on the outcome of his mental competency hearing in Los Angeles, and in that report announced that no further motions would be filed. (Doc. No. 123. at 4.) The government filed an answer to Gonzales' First Amended

---

[1] Before accepting Gonzales' plea agreement, the Los Angeles County Superior Court held a section 1368 mental competency hearing. *See* Cal. Penal Code § 1368. During the hearing Gonzales "admitted, both in writing and in open court, that he had spent years malingering and being dishonest in his attempts to be found incompetent and achieve better placement in the department of corrections." (Doc. No. 132, Ex. B at 1.)

Petition addressing only those claims either stipulated as timely or deemed by the Court to relate back to the original petition. (Doc. No. 128 at 23-55.) Gonzales responded without raising the issue of equitable tolling of claims deemed to not relate back. (Doc. No. 140.) Issues not argued to the district court are generally deemed waived. *White v. Martel*, 601 F.3d 882, 885 (9th Cir. 2010) (internal citations omitted). Given that Gonzales was represented by counsel, he failed to raise the equitable tolling issue after the Los Angeles mental competency hearing, his counsel represented to the Court that there is no intention to do so, and the parties' filing subsequent pleadings, any equitable tolling argument is deemed waived. *See id.* Thus, of the ten claims alleged in Gonzales' First Amended Petition, only six are before this Court.

## STATEMENT OF FACTS

### 1. Barbara Muszalski's Murder.

On the evening of April 12, 1992, Barbara Muszalski's ("Muszalski") body was found under a pile of hay in the bed of her pickup truck parked in the parking garage of the San Francisco International Airport. Gonzales was tried and convicted in 1998 for murdering Muszalski based on the evidence as summarized by the California Court of Appeal:

> Evidence offered at trial in support of the murder charge by the prosecution showed that appellant became romantically infatuated with the victim Barbara Muszalski in late 1991 and early 1992, after he had been told he was HIV positive. Appellant was then working for David Williams at his ranch outside Livermore, in exchange for room and board there, along with a small weekly stipend. Barbara and her husband Jim Muszalski lived on a nearby ranch, and were close friends of Williams. Appellant became acquainted with the Muszalskis through Williams, and sometimes performed errands on their ranch.
> By early April of 1992, Barbara complained that appellant had become obsessed with her. Appellant harassed her with constant telephone calls in which he urged her to leave her husband and "run away with him." Barbara told Williams that she had argued with appellant, and told him to "leave her alone." She no longer felt comfortable at Williams' home with appellant there. Williams stated that he would move appellant out of his house if "this is what it's come to." Jim was also aware of appellant's infatuation with Barbara, and warned him "to stop calling there."
> On April 9, 1992, when Jim left the ranch in the morning, Barbara was still there and her pickup truck was parked in the front of the house. Two women with whom Barbara had scheduled appointments at the ranch during the afternoon showed up, but did not find the victim or her truck present. Barbara's truck was observed by a mail carrier in front of the driveway at the Williams' residence at around 11:00 a.m. that day. Appellant was seen in the Highland Hospital outpatient registration line by Ivan Meyer, and HIV test counselor with whom he was acquainted, between 2:00 and 4:00 that afternoon. Appellant was "very needy" and

"demanding" in expressing that he "needed to talk" to Meyer. Appellant's presence was otherwise not unusual.

Jim discovered that Barbara and her truck were gone when he arrived home around 4:30 p.m. He received a call an hour later from appellant, who asked for the telephone number at Williams' house. Appellant was insistent and forceful, which was not his usual personality. About 7:30 p.m., Williams came to the Muszalski residence. Jim asked if he had seen Barbara; Williams "indicated that he hadn't." Jim was "very upset" and worried about Barbara's absence.

Williams proceeded to his house, where he "didn't see any sign" of appellant. Appellant called Williams at 10:15 p.m.; his voiced sounded "wired." Appellant said he missed his bus at the hospital and needed a ride home. Williams agreed to pick him up, and asked if appellant had seen Barbara that day, whereupon appellant became very agitated and defensive. He asked, "why are you asking me this question ...? I don't know anything." The next morning Williams noticed that appellant and his clothes were missing.

Barbara's pickup truck was found in the San Francisco International Airport parking garage the evening of April 12, 1992. According to inventory records, the truck entered the parking garage before 11:00 p.m. on April 9, 1992. Barbara's body was discovered in the bed of the truck under some hay. An autopsy revealed that she died from loss of blood caused by multiple stab wounds.

Blood stains detected in the cab of the truck, on a purse and reading glasses left in the passenger compartment, on the exterior doors, and on the tailgate, were identified by DNA testing as the victim's. Some of the blood stains had been partially wiped clean. Appellant's fingerprints were taken from an apparent blood stain on the tailgate. Bottles of Maalox were found in the cab of the truck that had the same lot numbers as others left in the bathroom used by appellant in Williams' house. Appellant was known to use Maalox, but Barbara and Jim did not. A blue electric blanket with apparent blood stains on it also discovered in the truck cab was identified by Williams as one removed from his home; the blanket had been clean when it was taken.

(*People v. Gonzales*, No. A085962 (Cal. Ct. App. Nov. 17, 2000), Ex. 39 at 4-6.)

Gonzales' murder trial was delayed for several years due to his apparent mental incompetency.

## 2. Initial Competency Hearings.[2]

Between 1995 and 1997, the trial court adjudged Gonzales as incompetent to stand trial on several occasions, although his examining doctors questioned whether he was malingering. Ultimately, the trial court adjudged Gonzales as malingering and competent to stand trial in July 1998.

---

[2] Documents and reports submitted to the state trial court and submitted to this Court are cited according to the Bates stamp beginning with GH. All references to the Gonzales' 1998 competency hearing and trial transcripts are cited as RT, and references to the clerk's record are cited CT.

i. *Gonzales' first mental competency hearing.*

On September 6, 1995, at defense counsel's request, the state court ordered a mental competency evaluation. (Ex. 45 at GH000012.)  Three doctors examined Gonzales and unanimously found him incompetent to stand trial.  (Ex. 47 at GH000392-97.)  However, one opined with reservations.

In a letter dated September 7, 1995, one of the doctors, Dr. Gudiksen, described information she gathered about Gonzales:

> [Gonzales] stabbed his previous attorney as the trial was getting started in March 1995.  He reportedly has had multiple head injuries.  He is HIV+.  His present attorney, Mr. Thews, is finding him increasingly difficult to work with ... The defendant whispers sometimes when talking to his attorney.  He expresses more and more suspicions to his attorney involving more and more people ... .

(Letter from Dr. Gudiksen to Judge Baranco, Sept. 7, 1995, Ex. 47 at GH000392.)

Dr. Gudiksen then described her encounter with Gonzales: "He was alert. He had an intense, rather angry appearing look on his face.  His voice was loud.  What little he had to say was coherent. ... Our interview quickly progressed to him saying to me 'F--- you ... go away.'" (*Id.*)  Dr. Gudiksen then opined that Gonzales had a psychosis with paranoid features, and that the cause "could be his repeated head injuries and/or dementia secondary to his HIV+ status" and that he was mentally incompetent.  (*Id.*)

Dr. Fort, another examining doctor, by letter dated September 12, 1995, also opined that "there [was] sufficient basis to find [Gonzales] mentally incompetent," but added "there is a possibility of some or considerable malingering designed to effect an escape."  (Letter from Dr. Fort to Judge Baranco, Sept. 12, 1995, Ex. 47 at GH000394.)  Dr. Fort described his interactions with Gonzales:

> When Mr. Gonzales was brought to the interview he complained about being awakened & repeatedly asked for coffee: said he thought he was being brought to see a lawyer, didn't want to talk to a doctor, & "I want to get out of here."  Most of the time he was unresponsive to questions, would abruptly stand up from the chair or sit on the floor, appeared to be hallucinating, complained of headaches & the need to be at pill call to get Motrin, stared at his outstretched hands in apparent fear & tears as he asked, "why are they this big?"  There was no response to my questions about court procedures ... The examination abruptly ended when he stood up and repeatedly screamed to me & the Deputy to "open the fucking door."

(*Id.*)

Finally, the examining doctor, Dr. Wornian, by letter dated September 29, 1995, opined that Gonzales was incompetent to stand trial. (Letter from Dr. Wornian to Judge Baranco, Sept. 29, 1995, Ex. 47 at GH000395-97.) Dr. Wornian indicated that:

> While it may well be the case that Mr. Gonzales is an extraordinarily cunning and malicious individual, the nature of his prior criminal actions suggests some form of paranoid disorder may well be operative. This, it must be acknowledged, is a highly speculative and tentative offering that unquestionably requires a much more detailed investigation in its own right.

(*Id.* at GH000396.) Dr. Wornian further stated that "given [Gonzales'] essential lack of cooperation ... it is simply impossible to give a precise delineation of his actual diagnostic status." (*Id.*)

The state trial court found Gonzales mentally incompetent to stand trial and ordered him sent to Atascadero State Hospital for review. (Ex. 45 at GH000014.) For administrative reasons, Gonzales was later transferred to Patton State Hospital ("Patton"). (*Id.* at GH000017.)

ii.     *Subsequent mental competency hearings.*

Between 1995 and 1997, Gonzales was sent back and forth several times between Patton and the state court to determine his mental competency. Each time, Patton certified Gonzales as competent.

On June 21, 1996, Patton discharged Gonzales to the court.[3] (Discharge Summary, June 21, 1996, Ex. 47 at GH000401-02.) The certificate of mental competency produced by Patton staff noted that Gonzales was suffering from AIDS-related dementia, had impaired memory and orientation, but that "he became well oriented and his memory problems cleared up almost completely. ... Haldol and Cogentin [medication] were discontinued, and his mood improved markedly and he did very well for the remainder of his stay." (*Id.* at GH000401.) However, after another competency hearing, Gonzales was returned to Patton as incompetent on October 31, 1996. (*Id.* at GH000424.)

---

[3] To return a previously adjudged incompetent defendant to court, the reviewing hospital staff is required to submit a certificate of mental competency to the court supporting restoration. *See* Cal. Penal Code § 1370.

In March 1997, Patton staff again certified Gonzales as competent to stand trial. (*Id.* at GH000442-44.) He was again adjudged mentally incompetent by the court and sent back to Patton June 1997. (*Id.* at GH000424.)

   iii.   *Final competency hearing for Gonzales' 1998 trial.*

On June 26, 1997, less than ten days after Gonzales' previous mental competency hearing in court, Patton staff again certified Gonzales as competent to stand trial. This time Patton staff diagnosed Gonzales as malingering in its certification of mental competency ("Patton Report"). (Letter from Patton State Hospital to Judge Baranco, June 26, 1997, Ex. 47 at GH000416-420.) Specifically, the Patton Report stated that since his return to the hospital, Gonzales had not demonstrated psychotic symptoms or dementia, that Gonzales was no longer prescribed or using psychotropic medication, and that his lack of cooperation with hospital staff at that time may be volitional in light of his apparent cooperation with court-appointed alienists. (*Id.* at GH0000417.)

The Patton Report further supported a finding of malingering with specific accounts of Gonzales' apparent duplicitous conduct:

> On June 26, 1997, the Interdisciplinary Treatment Team met with Mr. Gonzales to review and update his treatment program and to evaluate his mental competence to stand trial. During the evaluation, Mr. Gonzales was evasive and uncooperative with the interview and frequently refused to answer questions. When asked the date he responded that he thought it was 1996, then stated that maybe it was 1997, and then self corrected saying it was 1986. He correctly identified the month as June, but stated that he did not know the day. When pressed, he thought it was the first half of the month. ...
> Subsequent to Mr. Gonzales' staffing conference, the unit supervisor pointed out [to] him that he had forgotten to date a letter. Without hesitation, Mr. Gonzales wrote the correct date on the letter which clearly indicated that his disorientation for 'time' during the conference interview was feigned. In addition, a letter written to the female staff member on Unit 35 [] was clinically evaluated for indications of psychosis and dementia. Mr. Gonzales' letter contains grammatical and punctuation errors consistent with a limited education (the social history indicates that he has a sixth grade formal education), and demonstrates a micrographia indicative of constriction found in obsessive compulsive personalities rather than a dementia. Evidence of suspiciousness, manipulation, and mild perseveration is observed in his writing; however, psychotic symptoms and cognitive impairment of the degree observed by alienists is not present.
> During the court-ordered evaluation conducted by Dr. Wornian, Mr. Gonzales insisted that he could not spell and refused to cooperate in reading or spelling. Mr. Gonzales' letter in his own handwriting demonstrates his ability to spell and understand the correct meaning and usage of such words as: manipulate, destruction, agony, pleasure, imagine, classification, especially, emotions, and

7

frustration. Furthermore he was unable to repeat the alphabet, draw a clock with the hands ten after eleven, or count backwards from 20 by 1's, as requested by Dr. Wornian. This level of performance is highly inconsistent with the level of writing ability, thought processes, and the concepts present in Mr. Gonzales' letter to the female staff member on Unit 35....

Mr. Gonzales' clinical presentation is consistent with the intentional production of false or grossly exaggerate symptoms of cognitive impairment, and the performance of someone who is not fully cooperative with his attempts to evaluate his competency to stand trial.

(*Id.* at GH000425.)

Following Patton's final certification, the court ordered Doctors Gudiksen, Burstein, and Wornian to evaluate Gonzales. (Ex. 45 at GH000042.) Dr. Gudiksen and Dr. Burstein opined that Gonzales was competent, while Dr. Wornian gave no formal opinion.

In Dr. Gudiksen's opinion, Gonzales was "in the best condition that [she had] ever seen him in." (Letter from Dr. Gudiksen to Judge Goodman, Nov. 6, 1997, Ex. 47 at GH000503.) She also noted that "as usual, he is unable or unwilling to be very productive of information ... he wrongly says that it is 'Saturday' and 'still '86.'" (*Id.*) However, Dr. Gudiksen also noted that Patton "made a strong case for their diagnosis of malingering," and opined that he was mentally competent to stand trial. (*Id.*)

In opining that Gonzales was competent, Dr. Burstein reviewed the Patton Report and attempted to interview Gonzales. (Letter from Dr. Burstein to Judge Goodman, Nov. 9, 1997, Ex. 47 at GH000504-05.) Dr. Burstein noted that he based his opinion on both the Patton report and Gonzales' lack of cooperation during interviews. (*Id.*) Dr. Burstein considered the Patton Report as "compelling clinical data ... the reliability of which [was] based on **weeks** or **months** spent assessing him rather than the hours spent by the three previous court-appointed clinicians and myself." (*Id.* at GH000506-507.)

Dr. Wornian did not give a formal opinion of Gonzales' mental competency. However, Dr. Wornian noted that the Patton Report was inconsistent with Gonzales' behavior during prior evaluations and that Patton staff had "an abundance of evidence to recommend that [Gonzales] has engaged in malingering on [those] prior ... evaluations." (Letter from Dr. Wornian to Judge Goodman, Nov. 19, 1997, Ex. 47 at GH000510-11.) Specifically "Gonzales' efforts to convey a fairly profound memory impairment in memory function and capacity, [compared to] the report

**United States District Court**

For the Northern District of California

of his spontaneously and correctly providing the date on a letter is, simply, telling and speaks once again to a significant volitional dimension in his refusal to cooperate." (*Id.* at GH000510.)

From July 6 to July 8, 1998, the state court held a competency hearing. Hayward Blake, defense counsel's private investigator, and Gonzales testified for the defense; the State called several Alameda County Sheriff's Deputies, and Dr. Burstein as witnesses. (CT 445, 447-48.)

Blake testified that he had previously met with Gonzales five times between 1995 and 1997. (RT 21-22.) Each time Blake met with Gonzales, Gonzales appeared disoriented, did not directly answer the questions Blake posed, and instead spent most of the interview discussing his self-inflicted injuries or a nurse at Patton State Hospital named "Penny." (RT 23, 26, 29-30.) Blake noticed that at times Gonzales would drift in and out of different topics mid-sentence. (RT 32.) Gonzales also communicated that he had stabbed himself to gain better telephone access. (RT 41.) Blake ultimately testified that in his opinion Gonzales did not understand the nature of the charges against him, and could not assist in his own defense. (RT 153-54.) However, Blake — an investigator without psychiatric or psychological training — did not interview any of the sheriff's deputies who regularly interacted with Gonzales, and did not review any previous reports that indicated Gonzales may have been malingering. (RT 155-56.)

Gonzales, during his testimony, spent much time discussing a "dome" that everyone was under, and that it was his understanding that he was being charged for leaving the dome. (RT 47-48.) Gonzales also testified that he was hearing voices because of his "tendinitis or whatever." (RT 49.) When asked the date he stated that it was July, but was unsure of the day. (RT 52.) He also stated that there were twelve months in a year and named the months in correct order starting with January. (*Id.*) However, when asked the year he stated that it was "1984." (RT 53.)

Gonzales' testified that he perceived tunnels, dark and light lights and what he reported as other people in the court room trying to take his energy. (RT 55-58.) He indicated that the presiding judge, the prosecuting attorney, and defense counsel were all trying to "feed off [his] energy." (*Id.*) Gonzales also claimed that defense counsel was helping the prosecuting

attorney. (*Id.* at 58.) Gonzales also discussed his perceived ability to hear others' thoughts. He claimed that he could hear the district attorney, and the court clerk thinking about how to take Gonzales' "light." (RT 63-64.) Gonzales also testified that he sometimes put paper in his ears to block out others' thoughts. (*Id.*)

The State called Sheriff's Deputy Alvarez to testify about his interactions with Gonzales while Gonzales was incarcerated. Alvarez testified that Gonzales was in administrative segregation and had to follow a lot of rules. (RT 99.) Alvarez also testified that Gonzales had demonstrated an understanding of the rules in administrative segregation by following orders regarding cell cleanliness, and that Gonzales had never mentioned being disoriented as to date and time, had never before mentioned "being in the dome," or talked about light or taking away other people's energy. (RT 99-100.)

Finally, the State called Dr. Burstein, an expert in forensic psychology, to testify about his opinion regarding Gonzales' mental competence to stand trial. (RT 208.) During cross-examination, Dr. Burstein explained:

> There are two main building blocks for my opinion which I cited in the last paragraph of my report. One that was very compelling was hospital records, and the second was that in the limited time I had with Mr. Gonzales he was thoroughly uncooperative, resistant, and defiant for reasons that seemed self-serving to me. And, furthermore, Dr. Gudiksen, who I had seen prior to my futile attempt to interview [Gonzales], told me that she interviewed him and found him to be in the best mental condition that she'd ever seen him, so that my own observations and the Patton records were all three pieces of very compelling evidence suggesting that [Gonzales] was competent.

(RT 234-35.) When asked whether it seemed Gonzales had regained his competency, Dr. Burstein stated: "No ... I don't believe at all that [Gonzales] regained his competence. That would presume he was at one point incompetent. I don't believe he ever was." (RT 238-39.)

After hearing Dr. Burstein's testimony, the state court ruled on Gonzales' mental competency:

> I've reviewed very carefully all the documentary evidence which has now been received in evidence. As you're aware, I spent – as I indicated on the record I would, I spent the afternoon and into the evening yesterday reviewing the various tape recordings and the transcripts of the tape recordings of various telephone conversations, all of the medical records of both Patton Sate Hospital and Dr. Burstein, Dr. Wornian, Dr. Gudiksen, the various other documents which are

contained in the exhibit list ... in all cases I read and reread and reexamined those more than once, one reading and comparing them with each other.

...

As counsel have indicated, the defendant has the burden of proof in a proceeding such as this under Section 1368 of the Penal Code and related sections. The burden of proof is to convince the trier of fact by a preponderance of the evidence that the defendant is mentally incompetent.

I feel based on a very thorough and as careful as I'm capable of review of all the evidence in this case ... it is my finding that the defendant has failed to meet his burden of proof, that he has not convinced me by a preponderance of the evidence that he is mentally incompetent, but I feel that the evidence warrants some further findings.

...

I further find that the evidence establishes beyond a reasonable doubt that the defendant is, in fact, a malingerer and he has, in fact, been a malingerer for all the relevant periods of time that are encompassed in the documents and testimony here.

I think there is – as I recall the testimony of Dr. Burstein, it is certainly reflected in his report as well as the reports of the other alienists whose reports are before me, and it is strongly, substantially, powerfully corroborated by the testimony of people who have testified here who have seen and heard and interacted with Mr. Gonzales on situations which have been described by Dr. Burstein as more normal, that is, not involving direct communication with a mental health worker. I think the sheriff's deputies' testimony speaks volumes for Mr. Gonzales' competency and his ability to understand the nature and quality of his position and with respect to the nature of the criminal proceedings, his ability as opposed to his willingness, but his ability to assist counsel in the conduct of the defense in a rational manner.

The telephone calls also speak volumes of a person whose mental capacity is fully intact, whose cognitive abilities are fully intact, whose ability and willingness to engage in what are really elaborate and complex and comprehensive plans to achieve his own ends, many of which are connected directly to this case, indicates to me that this is a person who is completed [sic] and totally competent.

(RT 268-270.)

*iv.    Gonzales' most recent mental competency evaluation.*

As previously noted, in  the Los Angeles Superior Court found Gonzales competent to stand trial for another, unrelated, murder.  Two doctors submitted evaluations for the Los Angeles hearing, and neither opined that Gonzales was incompetent.  (Ex. 47 at GH000598, GH000609.)

Dr. Romanoff, the psychiatric examiner requested by defense counsel, stated that "it is extremely difficult to arrive at any definitive conclusion regarding [Gonzales'] mental state at any fixed point in time." (*Id.* at GH000609.)  He also stated that the history of information about Gonzales was contradictory, and that there was "no question in [his] mind that Gonzales [had] on multiple occasions consciously exaggerated and fabricated symptoms of psychiatric

11

and cognitive impairment in an obvious effort to pursue stated and unstated goals ...." (*Id.* at GH000608.) Dr. Romanoff did not believe that Gonzales suffered from AIDS-related dementia sufficient to support a finding of current incompetency. (*Id.*)

**3. Gonzales' 1998 Trial.**

Gonzales' trial commenced in October of 1998. (Ex. 45 at GH000056.) After several delays and jury selection, on November 17, 1998, both the State and defense presented opening statements to the jury. (*Id.* at GH000085.)

    *i.*     *Gonzales' demeanor and actions during the proceedings.*

Gonzales' behavior during trial was bizarre. He repeatedly stuffed paper into his ears as earplugs and slept through parts of the trial. (RT 349, 534-35.) The trial judge was aware of Gonzales' actions and frequently discussed Gonzales' demeanor on the record. (RT 350, 377-78, 534-35.) The judge observed Gonzales responding to directions and the requests by the sheriff's deputies so that they would remove restraints and allow him to leave through the side exit. (RT 350.) When he returned, Gonzales was able to follow directions but put earplugs into his ears and placed his head down on the table. (*Id.*) The judge determined, based on his observations that Gonzales was compliant with the bailiff's requests, and that Gonzales' lack of alertness was voluntary. (*Id.*)

Gonzales later stripped his clothing in the courthouse. Testimony revealed that Gonzales — who was required to change clothes before entering the courtroom due to a history of hiding weapons and a previous attack on his former attorney — had objected to changing his clothes before entering the court and threatened his guards that he would take them off. (RT 650-52.) The guards later found several jail-made weapons in Gonzales' cell. (RT 652.)

Gonzales repeatedly injured himself before and during the trial. In November 1997, Gonzales stabbed himself with a sharpened pencil. (RT 610.) He later stabbed himself with a sharpened handle from a plastic spoon. (RT 615.) Many of these wounds were self-inflicted in order to attain better privileges, and were consistent with other manipulative practices Gonzales used to gain privileges, such as making unauthorized phone calls. (RT 809-813.) The night before the evidentiary portion of trial, Gonzales wounded himself again by using a copper clasp

**United States District Court**

For the Northern District of California

from a manila envelope and a pencil. (RT 1244-45.) The court noted Gonzales' history of harming himself in order to attain phone privileges, and revoked such privileges except for the right to call his attorney. (RT 1264-66.)

Later, Gonzales refused to take his AIDS medication until he saw a doctor at Highland Hospital for self-inflicted stab wounds. (RT 2077.) Gonzales indicated that he understood of the gravity of his actions when he stated:

> The last two surgeries I did was less worse than this one. I got two five-inches [sic] pieces of metal in me I sharpened until they were like ice picks where I know that's going to do damage inside and still haven't saw [sic] medical doctors. One doctor opened up my shirt and said your wound is healing, you can go to court. That was it. Eight hours, seven hours after the second time I put it in, I shoved it in my same hole I put the pencil in me, and I got a piece of five-inch steel in me, not counting the other five-inch piece of steel in me the time before. ... How do they know what I punctured inside with no examination?

(RT 2078-79.) However he refused to see the doctor at North County Jail, and insisted instead on going to Highland Hospital. (*Id.*)

On many occasions Gonzales inappropriately commented to the jury that he was in chains, and exposed his restraints so they could see them. (RT 955.) At one point, Gonzales elevated himself and raised his arms to show his shackles and stated out loud in front of the jury, "I'm in chains." (RT 1063.) On at least twelve occasions, Gonzales lifted his arm slowly to scratch his head and visibly jiggled his chains. (RT 1064.) During voir dire, he requested that he be able to loosen his shackles. (RT 1164-65.) When the court denied Gonzales' request, Gonzales pronounced in front of the jury, "I want to plead guilty to everything." (RT 1165.)

Finally, Gonzales indicated that he wanted to testify, at which point his attorney renewed his motion to hold another mental competency hearing. (RT 2787.) Gonzales' counsel cited Gonzales' self-inflicted wounds during trial and Gonzales' repeated in-court declarations that he "is guilty of everything" as a change in circumstances indicating that Gonzales did not understand the gravity of the charges pending against him. (*Id.*) The court denied the motion and instead found that:

> I've had occasion to observe Mr. Gonzales throughout a very lengthy series of in-limine motions, pretrial motions, and, of course, the trial itself.
> I have, in fact, engaged him on several occasions with permission of counsel in various particulars, also in personal colloquy, the most recent of which occurred

13

earlier today where I did, in fact, inquire as to whether or not he was fully aware of the nature of the proceedings that would follow in view of his request to leave the courtroom.

And his responses where appropriate. They were cogent. They indicated his cognitive powers were fully intact. They indicated that he was fully aware of the nature of these proceedings, and they indicated that in view of the proceedings of which he was aware he had certain desires that he wanted the Court to grant.

...

It is true that Mr. Gonzales has several times during the course of this trial inflicted wounds upon himself, but it is also true that on at least five other incidents before this trial ever began, in fact, before the competency trial began earlier this year, that Mr. Gonzales had done exactly the same thing to achieve certain goals, and those goals ... were to delay these proceedings, to either stop them or delay their inception.

So the fact that he has done twice during the course of this trial that which he has done five times earlier for similar motives is certainly not a substantial change in circumstances or new evidence.

...

And my finding is that, as I've indicated, in view of all of the proceedings that occurred in the competency trial, in view of all the proceedings that we dealt with at such great length out of the presence of the jury or before the jury trial began in-limine motions in this court ... there are no substantial changes of circumstances, no new evidence, no evidence of any kind to convince the Court that, in fact, its earlier ruling was wrong or that the facts warrant a change from the earlier rulings.

(RT 2796-99.)

### ii. Gonzales' testimony and introduction of pretrial competency evidence.

Gonzales testified in his own defense, but in doing so confessed to all crimes charged except for the charge of attacking another inmate. (RT 2843, 2853-55, 2893.) Although he refused to follow the direction of his attorney, often asking his attorney to allow him to testify in his own words, he responded to both his attorney's and the court's questions and repeatedly stated he was neither insane nor incompetent, and that he wanted "the truth to be known." (RT 2843, 2845-46, 2879.)

Gonzales testified that he killed Barbara Muszalski out of rage during an argument, and that he killed Dodi Johnson in Los Angeles and Yvonne Haulsey in New York as part of his connection to organized crime.[4] (RT 2893.) Gonzales admitted that he attacked and stabbed his former attorney Leslie Chettle, because Chettle would not orchestrate his extradition to South America where he could "pay someone to get out [of prison]." (RT 2855.) However, Gonzales

---

[4] The murders of Johnson and Haulsey were entered into evidence as other crimes demonstrating intent, motive, or modus operandi. (RT 1031-35.) Gonzales has since pled guilty in Los Angeles Superior Court to murdering Johnson. *See supra* at 2.

1    maintained that he was not guilty of assaulting inmate Darrel Oliver because, he claimed, he

2    struck Oliver in self-defense.  (RT 2853-54.)

3          Gonzales then continuously insisted that Penny Shibata, his nurse while at Patton, be

4    subpoenaed.  He claimed she could testify to what he could not remember because he had told

5    her everything.  (RT 2878-887.)  Gonzales also testified that he and Shibata were having a love

6    affair and that she had taught him how to fake symptoms and was helping him plan to escape.

7    (*Id.*)

8          During cross-examination, Gonzales referred to himself several times as a "we" or as

9    "Bennie" or "Pete." (RT 2899.)  He claimed that he did not have multiple personalities.

10   However, Gonzales also testified that "Pete" attacked Chettle because "Pete" was angry with

11   Chettle.  (*Id.*)  Gonzales added that "Bennie" was probably the one who stopped Gonzales

12   during Pete's attack on Chettle.  (*Id.*)

13         Gonzales also testified that Patton staff members were trying to keep Gonzales in the

14   hospital although he wanted to leave.  (RT 2901.)  In response, the State questioned Gonzales

15   regarding reports presented at his mental competency.  (RT 2901-02.)  The State asked whether

16   Gonzales remembered the Patton Report that concluded he was faking his symptoms, and

17   whether Gonzales remembered that Dr. Burstein testified to the same at Gonzales' pre-trial

18   competency hearing.  (*Id.*)

19         Gonzales' counsel moved the court to reconsider the competency matter both before and

20   after Gonzales testified.  The court denied the request to hold a hearing on both occasions.

21         *iii.*     *Other acts evidence and jury instructions.*

22         During Gonzales' trial, the State entered evidence of the murders of Dodi Johnson in

23   Los Angeles and Yvonne Haulsey in New York as evidence of Gonzales' modus operandi of

24   befriending women, becoming infatuated with them, and then brutally killing them after they

25   rebuffed his romantic advances.  (RT 999-1015.)

26         After hearing argument, the trial judge found that, given the similarities of the crimes,

27   they could be used as evidence of Gonzales' intent, motive, and modus operandi.  (RT 1035.)

28   At the end of trial, the court instructed the jury that if they found that Gonzales committed the

other crimes by a preponderance of the evidence, they could use that evidence to support a finding of intent beyond a reasonable doubt.  (RT 3105-06.)

## JURISDICTION AND VENUE

Because Gonzales claims violations of the Constitution of the United States and has exhausted all remedies available to him in state court, this Court has subject matter jurisdiction. *See* 28 U.S.C. § 2254.  Furthermore, the remaining claims are timely because they were either originally filed within one year and 90 days, or relate back to claims filed within the statute of limitations.  (Doc. No. 115 at 13.)  Also, because Gonzales challenges his Alameda County Superior Court conviction, a state court within this judicial district, venue is proper.  *See* 28 U.S.C. § 2241(d).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971).  Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions apply.  *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

Under AEDPA, this Court may grant the petition with respect to any claim that was adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. section 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by section 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has explained repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential standard for reviewing state-court determinations. *See id.* at 436. Thus, the court has emphasized that "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and where there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002). Therefore, while a state court decision on the merits concerning a question of law normally should be afforded respect, "[i]f there is no such decision on the merits ... there is nothing to which to defer." *Greene*, 288 F.3d at 1089. In this case, the California Supreme Court denied Gonzales' petitions without opinion. Thus, the Court shall "look through" to the California Court of Appeal decision issued November 17, 2000. *See Shackleford*, 234 F.3d at 1079 n.2.

**ANALYSIS**

Gonzales' amended petition raises six remaining claims of error under the Fourteenth Amendment: (1) requiring him to prove lack of competency at his restoration hearing by a preponderance of the evidence violated due process; (2) the trial court failed to call a mid-trial competency hearing despite substantial evidence one was needed, and tried him despite his incompetence; (3) admitting Gonzales' testimony from his competency hearing offered by the prosecution at trial violated Gonzales' right to be free from compelled testimony and his right to counsel; (4) admitting psychiatric reports from Patton State Hospital and prior testimony from

Dr. Burstein violated his right to confront witnesses against him; (5) the jury instruction regarding evidence of other acts impermissibly diluted the prosecution's burden of proof; and, (6) his attorney's failure to challenge admission of Gonzales' competency evidence and the jury instructions constituted ineffective assistance of counsel.

Gonzales' challenges distill to three categories: (1) due process challenges involved in assessing his competency to stand trial; (2) due process challenges to the evidence admitted during trial and instructions regarding that evidence; and, (3) ineffective assistance of trial counsel.[5]

**1.      Gonzales' Due Process Challenges to His Competency to Stand Trial.**

Gonzales raises three due process challenges regarding his competency to stand trial: (1) requiring him to prove lack of competency at his restoration hearing by a preponderance of the evidence violated due process, and (2) the trial court failed to call a mid-trial competency hearing despite substantial evidence one was needed, and (3) tried him despite his actual incompetence.

*i.      Burden of proof at Gonzales' restoration hearing (Amended Claim One).*

First, Gonzales first claims that California Penal Code section 1368 facially violates due process as clearly established by the Untied States Supreme Court. According to Gonzales, section 1368 violates due process by assigning him the burden of proving mental incompetency by a preponderance of the evidence at his restoration hearing. "It is normally within the power of the State to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445 (1992) (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)). But, a state may not place too great a burden on a defendant whose competence is in

---

[5] Although this Court will address some of Gonzales' claims under the Fifth and Sixth Amendments, they are applied through the Due Process Clause of the Fourteenth Amendment.

doubt. *Cooper* v. *Oklahoma*, 517 U.S. 348, 352 (1996) (requiring the defendant to prove incompetency by clear and convincing evidence violates due process). However, "due process requires that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused is left to the legislative branch." *Medina*, 505 U.S. at 453 (quoting *Patterson*, 432 U.S. at 210).

Gonzales asserts that because he had already been deemed incompetent at prior hearings, assigning him the burden of proving lack of competency at his restoration hearing violated due process under *Cooper*. (Doc. No. 143 at 4.) The State argues that habeas relief is not warranted because federal law is not clear on whether California's presumption of competence in a restoration hearing after the defendant is certified as competent to stand trial by his mental health officer is a violation of due process. (Doc. No. 129 at 26.)

The Court of Appeal, relying on the California Supreme Court's holding in *People v. Rells*, correctly identified *Medina* and *Cooper* as governing law for assessing due process challenges to competency hearings. (Ex. 39 at 9-10 (citing *People v. Rells*, 996 P.2d 1184, 1190 (Cal. 2000).) Thus, this Court addresses only whether the California Court of Appeal, in analyzing *Rells*, unreasonably applied *Medina* and *Cooper* in denying Gonzales' due process challenge.

In *Rells*, the defendant alleged that interpreting section 1372 to presume a defendant was competent at a restoration hearing would be a violation of due process under the Fourteenth Amendment. *Rells*, 966 P.2d at 1189. The California Supreme Court rejected that contention, citing *Medina* and *Cooper* for the proposition that although due process requires that a defendant who is more likely than not incompetent not stand trial, the state can place the burden of proving competency on the defendant. *Id.* at 1190. The Court then extended the holding in *Medina* to cover restoration hearings, reasoning that the presumption of competence at a restoration hearing has the same effect as at an initial competence hearing. *Id.* The Court further reasoned that "the fact that a hearing presupposes an earlier finding ... of mental incompetence is balanced by the fact that the hearing itself is triggered by the later filing of a specified mental health official of a certificate of restoration to mental competence." *Id.* Thus,

20

according to *Rells*, the Fourteenth Amendment is not offended when the burden placed of proving incompetence is again placed on the defendant at a restoration hearing. *Id.*

In *Medina*, the United States Supreme Court held that placing the burden of proving incompetence on a defendant was not a violation of due process. *Medina*, 505 U.S. at 449. The Supreme Court further recognized that a procedure affecting competency hearings in only "a narrow class of cases where the evidence is in equipoise" did not violate due process. *Id.*

The procedure Gonzales challenges is similarly one that only affects a narrow class of cases, and only when the evidence is in equipoise. The precise procedure here places the same burden approved in *Medina* on the defendant, albeit after he has already been adjudged incompetent.

The fact that Gonzales was already adjudged incompetent may be a distinction without difference. The standard approved in *Medina* burdens the previously adjudged and the yet-to-be judged incompetent identically. The Supreme Court recognized that "although an impaired defendant might be limited in his ability to assist counsel in demonstrating incompetence, the defendant's inability to assist counsel can, in and of itself, constitute probative evidence of incompetence." *Id.* at 450. The Court's rationale necessarily assumes that some, even many, defendants will be incompetent to stand trial during the competency hearing approved in *Medina*. In either case, the defendant has to prove that it is more likely than not that he is incompetent to stand trial. *See Medina*, 505 U.S. at 449. As such, this Court cannot say it was objectively unreasonable for a court to adduce that it is no greater a burden for a previously adjudged incompetent defendant to prove his incompetence by a preponderance of the evidence at a restoration hearing than it is for an incompetent defendant (although then unknown to the court) to do so at his initial competency hearing. Thus, it was not objectively unreasonable for the Court of Appeal, through the reasoning in *Rells*, to deny Gonzales' due process challenge to his bearing the burden of proof in his competency hearing.

Gonzales' reliance on *Cooper* is misplaced. In *Cooper*, the Court invalidated Oklahoma's law requiring a defendant to prove incompetence by clear and convincing evidence because it allowed defendants to stand trial who were more likely than not mentally

incompetent. *See Cooper*, 517 U.S. at 352. As previously stated, California's practice does not — a defendant who is adjudged more likely than not incompetent at a restoration hearing is not subject to trial under section 1368. *Rells*, 966 P.2d at 1190. This standard satisfies the clear holding of *Cooper*.

Therefore, this Court rejects Gonzales' habeas challenge to the Court of Appeal's application of federal law to the standard of proof at his restoration hearing.

### ii. *Failure to call a mid-trial competency hearing and proceeding with trial (Amended Claim Three).*

Gonzales next claims that his federal rights were violated when the trial court refused to call another competency hearing mid-trial and tried Gonzales despite his actual incompetence. Gonzales states two claims regarding the same factual circumstances. A failure to call a hearing is a procedural due process challenge; while trying Gonzales despite his incompetence is a substantive due process challenge. *See Davis v. Woodford*, 384 F.3d 628, 646-47 (9th Cir. 2003).

### a. *Refusing to call a mid-trial competency hearing was not a procedural due process violation.*

A defendant's right to not be tried if mentally incompetent under due process requires procedures designed to guard jealously that right during trial. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966); *Drope v. Missouri*, 420 U.S. 162, 180 (1975). "The trial court must continually be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181. For purposes of AEDPA review, it is clearly established Supreme Court precedent in the Ninth Circuit that a trial court must order a competency hearing *sua sponte* whenever there is a bona fide doubt about the defendant's mental competency. *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010). A bona fide doubt exists where "a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced a doubt with respect to competency to stand trial." *Id.* (quoting *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)). A defendant's history of mental illness, demeanor at trial, defense counsel's opinion, and available psychiatric evaluations are all factors to be considered,

United States District Court
For the Northern District of California

but no one factor is necessarily sufficient to raise a bona fide doubt regarding mental competence. *See Pate*, 383 U.S. at 387. Furthermore, a "state trial and appellate courts' findings that the evidence did not require a competency hearing under *Pate* are findings of fact to which [the reviewing court] must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2003) (internal quotations omitted).

The cross-section of the Ninth Circuit's case law regarding mid-trial competency hearings sheds light on Gonzales' claim. In *Maxwell v. Roe*, failing to call a competency hearing was a due process violation where the defendant had a history of mental illness, was prescribed anti-psychotic drugs which he refused to take, attempted suicide during the trial, and was held under psychiatric care for over two weeks when it was determined by psychiatric staff and doctors that he was a danger to himself and others due to mental illness. 606 F.3d 561, 576 (9th Cir. 2010). The Ninth Circuit noted that the two-week psychiatric hold should have been enough to raise a reasonable doubt regarding the defendant's competency. *Id.* at 572-74. Furthermore, the court found that it was unreasonable to rely on a thirteen-month-old competency malingering finding based on eighteen-month-old psychiatric reports in the face significant and more recent evidence of deterioration. *Id.* at 565-66, 569, 572, 575.

Similarly, in *Odle v. Woodford*, the Ninth Circuit held that it was unreasonable not to call a competency hearing despite the defendant's apparent calm demeanor in the courtroom where the defendant had a history of well documented mental issues. 238 F.3d 1084, 1089 (9th Cir. 2001). Specifically, Odle had had a grapefruit-sized portion of his brain removed due to damage from a previous car accident; he had attempted suicide while in prison; family members testified that there was a remarkable shift in personality and actions after Odle's accident; and, doctors testified that it was unlikely that he would ever recover from his injuries. *Id.*

However, in *Amaya-Ruiz v. Stewart,* the Ninth Circuit, using a less deferential standard than required under AEDPA, determined that indicia of mental incompetency when taken in context of previously adjudged malingering did not require a competency hearing. *Compare Amaya-Ruiz v. Stewart*, 121 F.3d 486, 488 n.1, 491 (9th Cir. 1997) (Petitioner's habeas petition

1   was filed prior to AEDPA, thus was assessed under pre-AEDPA standard) *with Williams v.*

2   *Taylor*, 529 U.S. 362, 400 (2000). In *Amaya-Ruiz*, the state trial court had already held a pre-

3   trial competency hearing was held where two doctors, one suggested by defense and the other

4   by the prosecution, found him competent. *Amaya-Ruiz*, 121 F.3d at 489-490. Both doctors

5   expressed a concern regarding malingering and possibly that the defendant was consistently not

6   answering questions volitionally because he was instructed to do so by other inmates. *Id.* The

7   trial court adjudged Amaya-Ruiz to be competent and malingering. *Id.* at 490.

8       After Amaya-Ruiz's competency hearing, he did not cooperate with his attorney: he

9   claimed that he did not understand what it meant to testify, what the prosecutor's role was, and

10  whether the spectators or the jury would decide his fate. *Id.* During trial and his sentencing

11  hearing he had multiple outbursts, one while his attorney was trying to speak privately with

12  him, another while a government witness was testifying at a suppression hearing, and another

13  after being shackled at his sentencing hearing. *Id.* Amaya-Ruiz also attempted suicide in prison

14  after learning that his brother had died. *Id.* Despite the defendant's somewhat irrational

15  behavior, the trial court's refusal to call another competency hearing was upheld because:

16  "[previous] evaluations suggested Amaya-Ruiz was malingering and had chosen a strategy of

17  non-cooperation. His behavior and statements that he did not understand the proceedings are

18  consistent with a strategy of non-cooperation." *Id.* at 491.

19      The instant case is factually less like *Maxwell* or *Odle*, and more like *Amaya-Ruiz*.

20  Like in *Amaya-Ruiz*, the state court found Gonzales was malingering. A finding of malingering

21  is a factual finding and is presumed correct unless unreasonable. *See Amaya-Ruiz*, 121 F.3d at

22  492. Gonzales had been previously adjudged incompetent several times spanning from 1995 to

23  1997. Each time he was sent to Patton State Hospital, and after several months Patton staff

24  would certify him as competent, each time he would be again adjudged incompetent by the

25  court. Until in 1998, after a competency hearing that lasted several days, the trial court

26  determined that Gonzales was competent to stand trial and found that he was malingering. (Ex.

27  46 at GH000157-60.)

28

The trial court's finding was supported by several expert reports and ample testimony. Patton State Hospital issued a report that, in Dr. Gudiksen's words, "made a strong case for their diagnosis of malingering." (Ex. 47 at GH000502.) The Patton Report documented Gonzales faking his disorientation to date and time; when asked to date a letter he did so correctly without hesitation despite minutes earlier incorrectly stating the date. (Ex. 47 at GH000418.) That same report exposed that Gonzales feigned his inability to spell and understand complex words and concepts. (*Id.*) In a letter written to a hospital staff-member, Gonzales correctly used and spelled words like "manipulate, destruction, agony, pleasure, imagine, classification, especially, emotions, and frustration." (*Id.*)

Doctors Burstein, Gudiksen, and Wornian all opined that Patton's evidence of malingering was compelling, and Doctors Burstein and Gudiksen opined that Gonzales was competent. Dr. Burstein indicated that he did not believe that Gonzales was ever incompetent, and that the day-to-day observations by guards and Patton employees outside the presence of court-ordered evaluators were more credible and supported a finding of malingering. (*Id.* at GH000506-07.) Dr. Wornian indicated that there was "an abundance of evidence to recommend that [Gonzales] has engaged in malingering on prior ... evaluations." (*Id.* at GH000510.) Furthermore, sheriff's deputies testified that Gonzales had demonstrated an understanding of administrative rules while being held in prison. (Ex. 46 at GH000138.) The deputy testified that Gonzales had followed the rules regarding cell cleanliness and outgoing mail and that he never discussed "being in the dome" or talked about lights. (*Id.* at GH000138-39.)

Gonzales argues that other evidence — his own testimony, his apparent infatuation with his nurse, repeated self-mutilation, and his attorney's opinion that he was incompetent — undermines the trial court's determination that Gonzales was malingering and warranted a new competency hearing.

Gonzales' testimony, although unorthodox, does not undermine the reasonableness of the trial court's determination. Gonzales admitted that he had killed Muszalski, Johnson, and Haulsey in addition to "many others." (RT 2845, 2861-63.) He insisted on subpoenaing Penny

Shibata, his nurse with whom he allegedly had a love affair, to testify regarding the details he could not remember; often indicating that he wouldn't answer anymore questions until Shibata was subpoenaed. (RT 2876, 2882-85, 2911-16, 2921-23, 2926.) However, he also managed to inject other defenses into his case. He mentioned being in a rage when he killed Musalski, thus giving his attorney the opportunity to argue for voluntary manslaughter. (RT 2848-50.) Importantly, he also maintained that he was not guilty of the charged beating of inmate Darrell Oliver and indicated that he had fought Oliver in self-defense. (RT 2853-54.)

At times Gonzales was unresponsive to his attorney's questions, often refusing to answer based on the particular question asked. However, at no time did Gonzales indicate that he did not understand what was going on. On the contrary, he repeatedly announced that he was not insane, that he was not incompetent, and instead that he wanted to get this off his chest because he was likely going to die soon due to his suffering from AIDS. (RT 2843-45, 2861-63.) Furthermore, Gonzales' refusal to answer questions asked were marked not by confusion but by obstinance. When he refused to answer his attorney's questions he repeatedly stated that "he wanted to [confess] his way," and that admitting to the killings was hard for him. (RT 2861-63.)

The fact that Gonzales repeatedly stabbed himself is also not sufficient to undermine the trial court's finding of malingering. In fact, the court found that his self-mutilation was one of Gonzales' primary methods of manipulation to obtain special privileges. Before Gonzales was adjudged competent to stand trial, he had stabbed himself at least five times — each time to obtain better telephone access or other privileges. As the trial court found, his self-mutilation, which he had done previously multiple times, was consistent with, not contrary to, a finding of malingering and willful manipulation.

Although in *Maxwell*, it was unreasonable for a trial judge to not find a bona fide doubt about a defendant's competence despite a prior malingering finding, Gonzales' circumstances are distinct. First, unlike in *Maxwell*, Gonzales' history of malingering was supported by reports and hearings closer in time to his trial. The trial court found Gonzales was competent and malingering in July 1998; Gonzales' trial commenced fewer than six months later. In

26

comparison, there was an eighteen-month gap between the competency hearing and the trial in *Maxwell*.

Second, unlike *Maxwell*, Gonzales was not involuntarily committed to a state psychiatric hospital during trial. In *Maxwell*, the defendant was placed under a 72-hour psychiatric hold after a suicide attempt. *Maxwell*, 606 F.3d at 571. Two examining doctors then placed the defendant on a 14-day psychiatric hold because, as a result of his mental disorder, he was considered to be a danger to others and himself. *Id.* at 572. Gonzales, however, was not involuntarily held at the hospital, or involuntarily committed during his 1998 trial. Instead, Gonzales was only briefly hospitalized to treat wounds self-inflicted to attain better privileges.

Also, unlike *Maxwell* or *Odle*, Gonzales was not impaired by severe brain trauma or prescribed psychotropic medications to control psychosis. There was some evidence of head trauma and he was diagnosed with AIDS-related dementia, but the effects of that diagnosis was later adjusted to reflect his apparent malingering. Dr. Wornian specifically indicated that "while there are likely legitimate cognitive deficits displayed by [Gonzales], their character as displayed in the account of his daily activities appears to be mild. The suspected volitional contributions to what were taken to be his defective performances on the earlier 1368 evaluations stand out much more clearly given this broader view of [Gonzales'] capacities for everyday functioning." (Ex. 47 at GH000510.)

Gonzales relies on *Torres v. Prunty* to support his argument that not calling a hearing was unreasonable. (Doc. No. 103 at 12-13; Doc. No. 143 at 7 (citing *Torres v. Prunty*, 223 F.3d 1103, 1110 (9th Cir. 2000).) In *Torres*, the trial court's failure to call a mental competency hearing was ruled unreasonable. *Torres*, 223 F.3d at 1110. Torres was tried for shooting several people and taking a nurse hostage at the County/USC Medical Center ("USC"). *Id.* at 1105. Before trial, Torres was examined by a mental health professional who reported that Torres truly believed that USC and its staff were conspiring against him. *Id.* at 1106. Later, Torres' attorney indicated to the trial court that Torres was no longer cooperating because of his belief that both the attorney and the court were part of that conspiracy against him. *Id.* A

competency hearing was never held. *Id.* Instead, the trial court determined without questioning him, that Torres was not credible. *Id.* at 1109. The Ninth Circuit held that it was unreasonable for the trial court to have made factual findings contravening the evidence presented — specifically, the expert report stating that Torres truly believed there was a conspiracy — without holding a hearing. *Id.*

Gonzales' reliance on *Torres* is misguided in two ways. First, *Torres* was decided under the incorrectly less deferential "clearly erroneous" standard of review. *Compare Torres*, 223 F.3d at 1108 (applying "clearly erroneous" as synonymous with "objectively unreasonable") *with Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (overturning the Ninth Circuit's use of clearly erroneous as synonymous with objectively unreasonable under AEDPA). Any guidance from *Torres* is therefore based on an improper standard of review as a matter of law.

Second, Gonzales is readily distinguishable from *Torres* on the facts. Unlike *Torres* where no competency hearings were held, Gonzales was subject to several competency hearings, including one just a few months before trial where he was adjudged competent based on evidence of malingering. Moreover, all of the mental health experts in Gonzales' case were unanimous that there was substantial evidence of malingering, and not one stated that Gonzales was mentally incompetent. Furthermore, Gonzales, unlike Torres, was repeatedly questioned and his actions both in and outside of court were evaluated by the trial judge before finding again that Gonzales was malingering.

Thus, given Gonzales' history of manipulation and malingering, the trial court's determination that another competency hearing was not required was not objectively unreasonable. Gonzales' continued obstinance and his bizarre behavior was no different from his conduct during his pre-trial competency hearing where he was adjudged malingering. Therefore, Gonzales' procedural due process challenge to the trial court's refusal to call another mental competency hearing is denied.

        *b.    Gonzales was not tried despite his actual incompetence.*

To prevail on a claim of substantive due process, Gonzales must show that "at the time of trial he lacked either sufficient ability to consult with his lawyer with a reasonable degree of rational understanding, or a rational and factual understanding of the proceedings against him." *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2002) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)). This Court may consider facts and evidence not before the state trial court. *Id.* Furthermore, Gonzales is "entitled to an evidentiary hearing [in the habeas court] on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency [at the time of his trial]." *Boyd v. Brown*, 404 F.3d 1159, 1166 (9th Cir. 2005) (internal quotations omitted). Gonzales, however, has not raised such a doubt.

Gonzales asserts that evidence not considered by the state court confirms his lack of competency to stand trial. To support this claim, Gonzales cites evidence of his obsession with his nurse, Penny Shibata, Gonzales' repeated refusal to cooperate with counsel before and during trial, and Dr. Romanoff's mental competency examination almost ten years after Gonzales' conviction in which the doctor reports that Gonzales was "likely periodically incompetent." (Doc. No. 103 at 12.) Of the three newly alleged considerations, only the recent psychiatric examination by Dr. Romanoff was not considered by the trial court. However, retrospective psychiatric determinations are disfavored and usually afforded little weight, if any. *See Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2003). In this case, *Davis* is directly on point.

In *Davis*, the defendant's substantive competence claim was rejected where the reviewing doctor, seven years after trial, was equivocal and did not opine that the defendant was incompetent during his earlier trial. *Id.* The court noted that the doctor, although he stated that he believed that several psychiatrists would likely have found the defendant incompetent had the defendant been evaluated during his trial, "did not see fit to place himself within the company of those few psychiatrists." *Id.* Instead, the doctor "viewed [the defendant] as marginal, in the gray area between competency and incompetency." *Id.*

Like the doctor in *Davis*, Dr. Romanoff did not opine that Gonzales was incompetent during his 1998 trial. In fact, Dr. Romanoff opined that Gonzales was "likely ... (at least periodically) incompetent to stand trial" but he did not evaluate Gonzales' mental competence in 1998. (Ex. 47 at GH000610.) Rather, Dr. Romanoff's report evaluated his competence to stand trial in Los Angeles in 2006. (*Id.* at GH000609.) Regardless, like *Davis*, Dr. Romanoff's opinion was marked by ambiguity and uncertainty. He noted that "it is extremely difficult to arrive at any definitive conclusion regarding [Gonzales'] mental state at any fixed point in time." (*Id.*) Dr. Romanoff also stated that he believed Gonzales had in the past exaggerated and fabricated his symptoms; that Gonzales' exhibited low cognitive ability had more to do with malingering symptoms; and, that Dr. Romanoff did not believe that Gonzales' AIDS-related dementia could be used to justify finding Gonzales incompetent. (*Id.* at GH000608.) Furthermore, at Gonzales' subsequent mental competency hearing in 2007 in connection with Dodi Johnson's murder in Los Angeles County, Gonzales was again adjudged competent to stand trial. (Doc. No.143 at 1; Doc. No. 130 at 4.)

The species and weight of evidence Gonzales has presented does not support his claim of actual incompetence. Dr. Romanoff's psychiatric report is both too equivocal and too remote in time to raise a substantial doubt of Gonzales' competency to stand trial in 1998. Accordingly, and for the same reasons that this Court finds the trial court was not unreasonable in finding no substantial evidence of incompetence, this Court finds no substantial doubt as to Gonzales' competence during his 1998 trial.

**2. Gonzales' Evidentiary and Jury Instruction Challenges.**

    *i.    Admitting Gonzales' testimony from the pre-trial competency hearing (Amended Claim Seven).*

Next, Gonzales argues that allowing the State to use reports and testimony from his pre-trial competency evaluations and hearings was contrary to *Estelle v. Smith*, 451 U.S. 454, 465 (1981) (hereinafter "*Smith*"), and alternatively that the Court of Appeal unreasonably applied *Smith* and *Buchanan v. Kentucky*, 483 U.S. 402, 424 (1987) (hereinafter "*Buchanan*"), when affirming the trial court. Gonzales further argues that the trial court unreasonably

1   determined the facts when it found that Gonzales placed his mental status at issue, and that the

2   psychiatric evidence permitted was not based on Gonzales' testimony.

3        The Supreme Court's holding in *Smith* does not directly address Gonzales'

4   circumstances, therefore the state court's decision is not contrary to *Smith*'s clear holding.  In

5   *Smith*, the Supreme Court held that the Fifth Amendment prohibits the state from using

6   testimony taken during the defendant's court-ordered psychiatric evaluation without giving a

7   *Miranda* warning to prove elements of the State's case.  *Smith*, 451 U.S. at 465.   Doing so

8   without informing defense counsel the examination was taking place was also a denial of

9   assistance of counsel under the Sixth Amendment.  *Id.*  The instant case is factually distinct.

10  First, the *Smith* Court ordered the psychiatric evaluation, whereas in the instant case it was

11  requested by Gonzales' counsel.  *Id.* at 464.  Second, unlike *Smith*, Gonzales' psychiatric

12  evaluations did not elicit statements from Gonzales regarding the crimes he committed.  Last,

13  and most importantly, unlike in *Smith* where the State used the evidence to prove its affirmative

14  case, the State here used the psychiatric evaluations to rebut Gonzales' testimony.  *Id.* at 465.

15       Gonzales' remaining claims — that facts were unreasonably determined, and that the

16  law was unreasonably applied — implicate the Supreme Court's Fifth and Sixth Amendment

17  jurisprudence and will be addressed separately.

18            *a.      The state court's finding that Gonzales testified to facts that raised a
                       mental status defense was not objectively unreasonable.*
19

20       Gonzales claims, without citing any case law for support, that it was unreasonable for

21  the trial court to find that evidence from the Patton Report and Dr. Burstein's testimony were

    used solely to impeach Gonzales' credibility in response to a potential mental status defense.
22
    As previously noted when determining whether a state court's finding of fact was unreasonable
23
    on a habeas petition, the district court must only look to evidence presented before the state
24
    court, *Davis*, 384 F.3d at 644, and can only overturn the state court's factual findings if they are
25
    found to be unreasonable.  28 U.S.C. § 2254(d)(2).   In this case, it was not unreasonable for the
26
    state court to find that Gonzales' testimony (factually) raised issues that warranted him being
27
    impeached with psychiatric reports.
28

Before the State introduced statements from the Patton Report and Dr. Burstein, Gonzales had already made his mental status an issue. During direct examination, Gonzales testified several times that he was "hearing different things in [his] head," including different "spirits." (RT 2858, 2862, 2863, 2865.) During cross examination, Gonzales alleged that he really wanted to leave the mental hospital but Patton staff wanted to keep him. (RT 2900.) Furthermore, Gonzales also claimed that he killed Muszalski out of rage. (RT 2850.) Although Gonzales did not assert an insanity defense, his counsel did argue for the lesser charge of voluntary manslaughter. (RT 3073-76.)

Although Gonzales maintains that he did not sufficiently raise the issue of mental status, there is ample evidence in the record to support the trial court's findings. This Court holds that is was not objectively unreasonable for the state court to find that issues relevant to competency or a mental status defense were sufficiently raised before the jury to allow impeachment.

        *b.*     *The state court's application of Buchanan was not objectively unreasonable.*

Although Gonzales cites the Court of Appeal's extension of *Buchanan* in affirming the trial court as unreasonable, his claim hinges on application of *Miranda* and its progeny. The issue is whether it was objectively unreasonable in light of the Supreme Court's Fifth Amendment jurisprudence at the time of the Court of Appeal's decision to extend *Buchanan* to allow the State to impeach Gonzales using psychiatric evidence from Gonzales' pretrial competency evaluations and hearings. *See Buchanan*, 483 U.S. at 424.

In *Buchanan* the Supreme Court allowed use during trial of psychiatric evidence obtained at a pre-trial psychiatric evaluation to rebut the defendant's presentation of contrary psychiatric reports. *Id.* The Supreme Court noted that "if a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." *Id.* at 422-23. Where the defense filed a request to initiate an examination for involuntary hospitalization, and relied on the "mental status" defense of extreme emotional

disturbance, the State was allowed to introduce evidence from the involuntary hospitalization examination to rebut other psychiatric evidence. *Id.* at 423-24.

Gonzales contends that applying *Buchanan* to his circumstances was unreasonable because unlike *Buchanan*, Gonzales argues, he did not raise a mental status defense or present psychiatric reports. (Doc. No. 143 at 12-13.) Furthermore, Gonzales argues that unlike *Buchanan*, the evidence introduced during his trial was acquired from a pre-trial competency examination. (*Id.*) These distinctions, Gonzales concludes, sufficiently distinguish this case from *Buchanan* and, as in *Smith*, indicate that it was unreasonable to allow the state to use the psychiatric reports at all. (*Id.*) The State argues that the use of the evidence of Gonzales' competency evaluations was not unreasonable because the instant case is virtually indistinguishable from *Buchanan*. (Doc. No. 129 at 27.)

As an initial matter, this Court will not consider Gonzales' argument that as a matter of law he did not present a mental status defense. The presence or absence of a mental status defense to a state crime is quintessentially a state-law question. *Cf. United States v. Lopez*, 514 U.S. 549, 561-62 (1995). The Supreme Court has repeatedly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (hereinafter "*McGuire*"). Thus, this Court will not rehash the Court of Appeal decision that as a matter of law Gonzales raised a mental status defense. *See id.* Therefore, because the Court of Appeal considered Gonzales' plea to the jury to consider reducing the charge of first degree murder to voluntary manslaughter a mental status defense, this Court does the same.

Logically what remains of Gonzales' Fifth Amendment claim is that it was objectively unreasonable to allow the State to impeach him or to rebut his mental status defense with evidence acquired from his pre-trial competency hearing. The Fifth Amendment protects a defendant from being "*compelled* in any criminal case to be a witness against himself." U.S. Const. amend. V (emphasis added). Any statements taken in violation of the Fifth Amendment right against self-incrimination are excluded from the State's case in chief. *See*, *e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 466 (1966). However, in the context of impeachment or rebuttal, the

33

prophylactic protections of *Miranda* are not applied as strictly. While the Fifth Amendment prohibits the prosecution from impeaching a defendant with previously un-warned statements if actually coerced, *New Jersey v. Portash*, 440 U.S. 450, 459 (1979), absent evidence of actual coercion the amendment does not shield a defendant from impeachment. *Harris v. New York*, 401 U.S. 222, 225 (1971). In Gonzales' case (although faced with a potential Hobson's choice), he was not actually coerced by the State. *See Simmons v. United States*, 390 U.S. 377, 393-94 (1968) (forcing a defendant to choose between asserting one constitutional right or preserving the right to remain silent is a Hobson's choice).

In *Portash*, the Court disallowed using the defendant's testimony from a grand jury hearing where the State granted the defendant immunity. In doing so the Court noted "testimony given in response to a grant of legislative immunity is the essence of coerced testimony ... the witness is told to talk or face the government's coercive sanctions ... a conviction for contempt." *Id.* at 459.

Similarly, in *Mincey v. Arizona*, the Court disallowed use of statements for the purposes of impeachment that were taken under conditions that rendered them involuntary. 437 U.S. 385, 398-99 (1978). In *Mincey*, the defendant had just been severely injured and was in the hospital, where he had a tube inserted down his throat to help him breath. *Id.* at 396. A police officer, after administering *Miranda* warnings, began interrogating Mincey. *Id.* at 397. Mincey, responding by pencil and paper, requested a lawyer and for the interrogation to cease, but the officer continued in violation of *Miranda*. *Id.* The Supreme Court found that under these facts, the defendant's responses were not voluntary and could not be used to impeach the defendant when he testified at trial. *Id.* at 398.

As demonstrated by *Portash* and *Mincey*, in the case of impeachment, the Fifth Amendment protects defendants from being compelled by the State to speak involuntarily. Although Gonzales was compelled to have a competency hearing and submit to an evaluation under California Penal Code section 1369, Gonzales has not presented any evidence that his statements included in the Patton Report or within Dr. Burstein's testimony were actually involuntary. On the contrary, there is ample support in the record that Gonzales was free to

34

respond, or not to respond, at will. Each time he was asked questions he was free to refuse to answer, and many times he did refuse to do so. Furthermore, he was free to end his interviews or to change the subject. Unlike in *Portash* and *Mincey*, where the state used its coercive power to force specific answers to its inquiries, Gonzales was free to answer as he wished and without reference to any particular topic.

Thus, because Gonzales raised a mental status defense under state law, and there are no allegations or evidence of actual coercion, this Court concludes that it was not objectively unreasonable for the Court of Appeal to extend *Buchanan* to allow use of pre-trial competency reports to rebut the defense's mental status evidence or to impeach the defendant's testimony.

### c. Gonzales was not denied assistance of counsel.

Gonzales also alleges the trial court denied him effective assistance of counsel under *Smith* when it admitted psychiatric evidence from his pre-trial competency evaluations. The Sixth Amendment right to assistance of counsel, as incorporated through the Fourteenth Amendment, guarantees that the defendant has the assistance of counsel in understanding his rights during post-indictment psychiatric examinations. *Smith*, 451 U.S. at 471. "Such a consultation to be effective, must be based on counsel's being informed about the scope and nature of the proceeding," and possible uses of the testimony or reports. *Buchanan*, 483 U.S. at 424-25. Gonzales had this assistance.

Gonzales' counsel requested a competency hearing. The Court presumes that counsel apprised Gonzales of the risks inherent in submitting to a competency evaluation. *See Buchanan*, 483 U.S. at 425 (presuming that defense counsel apprised the defendant of the risks of speaking during a psychiatric evaluation). Also, unlike *Smith*, Gonzales' examiners did not venture beyond the scope of assessing Gonzales' competency, or elicit answers regarding Gonzales' charged crimes. Moreover, under the Supreme Court's holding in *Buchanan*, Gonzales' counsel had notice that testimony from the reports or the reports themselves could be used to rebut a mental status defense or possibly to impeach Gonzales' credibility if contrary to his representations at trial. *Id.* As such, this Court cannot say Gonzales was denied the opportunity to consult with counsel before submitting himself to psychiatric examination.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii.     *Admitting psychiatric reports and testimony without the declarants present for cross-examination (Amended Claim Eight).*

Gonzales also contends that the State's use of Dr. Burstein's testimony and the Patton Report violated his Sixth Amendment right to confront witnesses against him. The State contends that the disputed statements were not actually entered as evidence. Instead, the State claims that they were permissibly used as the basis for the prosecutor's questions. Therefore, according to the State, the prosecutor's statements do not present a Confrontation Clause problem.

The Court of Appeal did not decide this claim on the merits; therefore, it is reviewed de novo. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 & n.4 (9th Cir. 2002). Both parties agree that Gonzales' appeal was decided before *Crawford v. Washington*, 541 U.S. 36 (2004), pre-*Crawford* Confrontation Clause precedent applies. *See Winzer v. Hall*, 494 F.3d 1192, 1194 (9th Cir. 2007) (citing *Whorton v. Bockting*, 549 U.S. 406 (2007) (*Crawford* is not applied retroactively)). However, regardless the framework used, Gonzales must demonstrate prejudice from any alleged violations. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Even assuming that the State's use of the Patton Report and Dr. Burstein's testimony violated the Confrontation Clause, Gonzales was not prejudiced by their use. To demonstrate prejudice under habeas review, a defendant must show that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (reaffirming *Brecht* post-AEDPA). The court, to assess prejudice, should examine (1) the importance of the out-of-court declarant's testimony; (2) whether the evidence was cumulative; (3) the presence or absence of corroborating or contradicting testimony on material points; (4) the extent that cross-examination was otherwise permitted; and (5) the overall strength of the State's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 686-87 (1986). In this case, the evidence presented was not crucial to the State's case, and Gonzales was convicted by overwhelming evidence of guilt; therefore, Gonzales cannot demonstrate prejudice.

The Supreme Court's decision in *Brecht v. Abrahamson*, undermines Gonzales' claim. In *Brecht*, the Supreme Court held that although Brecht's rights were violated, there was no

prejudice requiring a habeas writ to issue. *Brecht*, 507 U.S. at 639. During his trial, Brecht claimed that he had tripped and accidentally shot his victim. *Id.* at 624. However, Brecht did not offer this explanation to police officers before or after he was arrested or after he was given *Miranda* warnings. *Id.* at 624-25. During trial, he was directly impeached with his post-*Miranda* silence in violation of the Fifth Amendment. *Id.* at 625 n.2. In addition, there was weighty physical evidence both contradicting Brecht's testimony and supporting the State's case. *Id.* at 639.

Evidence introduced at trial contradicted Brecht's claims. Forensic evidence from the victims wound and the gun's location did not match Brecht's claim that the gun fired when he accidentally dropped it. *Id.* Also, the State introduced evidence of a motive to shoot. *Id.* Although Brecht's impeachment went to the heart of his charges and his defense against them, in light of conclusive physical evidence and evidence of motive, the Supreme Court held that Brecht was not prejudiced. *Id.*

The alleged unconstitutionality in Gonzales' case is even further outside the radius of prejudice than that in *Brecht*. The Patton Report and Dr. Burstein's conclusions were used very little, the evidence was not as powerful as in *Brecht*, and there was overwhelming evidence of guilt. Like in *Brecht*, where the State impermissibly referenced Brecht's silence sparingly, the State introduced very little of both the Patton Report and Dr. Burstein's prior testimony against Gonzales. *See id.* After Gonzales claimed he was trying to leave Patton State Hospital, the State briefly questioned whether Gonzales remembered that the Patton Report and Dr. Burstein concluded he was malingering. Gonzales denied remembering either conclusion. Afterward, the the subject was not breached until closing argument where the State argued that Gonzales' attempts to reduce his charges to voluntary manslaughter should be denied, and his testimony indicating lack of mental awareness ignored because Gonzales had been caught faking psychological symptoms before. (RT 3024.)

The content of the statements offered against Gonzales were also not as strong as in *Brecht*. *See Brecht,* 507 U.S. at 639. Unlike *Brecht* where the State used Brecht's own statements to rebut his version of events, here the challenged evidence was used to rebut the

collateral matter of Gonzales' psychological symptoms. *Id.* Furthermore, unlike *Brecht*, the State did not use Gonzales' own statements. *See Id.* at 639; *see also Henry v. Kernan*, 197 F.3d 1021, 1030 (9th Cir. 1999) ("No other evidence of intent could have impressed the jury the same way as the defendant's own words."). The Patton Report and Dr. Burstein's conclusion did not directly relate to his state of mind at the time of the crime. Instead, both the reports and the testimony were used to rebut the collateral matter of Gonzales' testimony regarding hiws efforts to get out of the hospital and that Patton staff were trying to keep him there, and other testimony that indicated he had psychological defects. The statements were also used during closing argument to demonstrate that Gonzales was a "faker and a liar" regarding psychological symptoms, and that although he presented evidence indicating split personalities and incompetence, that he was in fact competent. Importantly, Gonzales' counsel did not argue an insanity defense. As such, the evidence admitted was less important than what was introduced in *Brecht*.

Furthermore, the State presented overwhelming evidence of guilt. The Court of Appeal noted that: testimony was introduced regarding Gonzales' strange behavior when asked about Muszalski around the time of the murder; bloodstains that matched Muszalski's DNA were found on the truck containing Muszalski's body, and Gonzales' fingerprints were found in an apparent bloodstain on the truck; a bloodstained blanket taken from Gonzales' residence and bottles of Maalox matching the batch serial numbers of several bottles in Gonzales' residence were also found in the bloodstained truck; evidence of flight was presented; evidence of two similar murders that Gonzales allegedly committed were presented to show intent; and finally, the unparalleled evidence of Gonzales' multiple in-court confessions was presented to the jury. *Cf. Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence.").

In light of the state's limited use of the challenged psychological evidence and the overwhelming evidence of Gonzales' guilt, Gonzales has not demonstrated prejudice. Therefore, Gonzales is not entitled to habeas relief for the alleged Confrontation Clause violations.

38

### iii. *Erroneous jury instruction regarding the prosecution's burden of proof (Amended Claim Nine).*

Gonzales alleges that jury instructions regarding other crimes evidence impermissibly diluted the State's burden of proving each element beyond a reasonable doubt. When reviewing a potentially ambiguous jury instruction, the settled test is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *McGuire*, 502 U.S. at 72. In this case, the is whether the instruction violated the due process requirement that the State bear the burden of proving each element of a charged offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). However, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)). The Court of Appeal identified correctly and applied the *McGuire* test, therefore this Court reviews only whether that application was objectively unreasonable. (Ex. 39 at 18-20.)

Gonzales argues that the instructions in his case are similar to those found unconstitutional in *Gibson v. Ortiz*. 387 F.3d 812, 823 (9th Cir. 2004) (hereinafter "*Ortiz*"). In *Ortiz*, the Ninth Circuit found that a California Court of Appeal affirmation of a jury instruction on permitted propensity evidence was an unreasonable application of Supreme Court precedent. *Id.* The jury instruction in *Ortiz* read:

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offense. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and *did* commit the crime or crimes of which he is accused.

*Id.* at 822 (emphasis added). It was then followed by:

> Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial.

*Id.*

There was no further instruction regarding the burden of proof. The Ninth Circuit found that the instruction allowed Ortiz to be convicted "if [the jury] found 'that the defendant committed a prior sexual offense.'" *Id.* Therefore, because the prior sexual offense could be found by a

39

preponderance of the evidence, Ortiz could be unconstitutionally convicted by a lesser standard than beyond a reasonable doubt. *Id.*

The instructions in Gonzales' case are distinguishable from *Ortiz* because they did not allow the jury to use the prior acts evidence to infer that Gonzales did in fact commit the charged crime, and because the total jury charge repeatedly instructed the jury after giving the other acts instruction that the State had to prove every element and guilt beyond a reasonable doubt. In this case, the jury instruction read:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that which he is on trial.
>
> Except as you will otherwise be instructed, this evidence, if believed, *may* not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show:
>
> One, a characteristic method, plan, or scheme in the commission of criminal acts similar to the method, plan, or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which the defendant is accused;
>
> Two, the existence of the intent which is a necessary element of the crime charged;
>
> Three, the identity of person who committed the crime, if any, of which the defendant is accused,
>
> Four, a motive for the commission of the crime charged.
>
> For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you as you do all other evidence in the case. ...
>
> Within meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed crimes other than those which -- for which he is on trial.

(RT 3105-06.)

As noted by the California Court of Appeal, the charge went on to instruct the jury:

> [To] establish that a killing is murder not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and the act which caused the death was not done in the heat of passion or upon a sudden quarrel.

(Ex. 39 at 19.)

The trial court further instructed:

> Each fact necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must also be proved beyond a reasonable doubt.

(*Id.*)

Gonzales reads *Ortiz* to hold that a trial court's general instruction on reasonable doubt cannot cure the infirmities of its specific instruction on other acts evidence. (Doc. No. 143 at 17-18.) However, Gonzales misreads *Ortiz*. The error in *Ortiz* concerned use of a general instruction *before* specifically instructing the jury on other acts evidence, not as in Gonzales' case where the jury was repeatedly instructed on reasonable doubt *after* the other acts evidence. *See Ortiz*, 387 F.3d at 822. Furthermore, the Supreme Court has previously rejected Gonzales' contention that any potential infirmity in a specific trial instruction must be corrected by another specific instruction. *Naughten*, 414 U.S. at 147.

In *Naughten*, the Court upheld a trial court's instruction that all witnesses were presumed to tell the truth despite the defendant's allegation that it impermissibly shifted the State's burden of proof to the defendant where the defendant chose to not put on any witnesses. *Naughten*, 414 U.S. at 149. In upholding the total instruction, the Supreme Court explicitly rejected the Court of Appeal's contention that any potential for error must be specifically addressed. *Id.* at 147. The Supreme Court stated "the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* Just as in this case, the Court also noted that the trial court explicitly reaffirmed twice that the defendant was presumed innocent and that the State had the burden of proving guilt beyond a reasonable doubt. *Id.*

The Court has also previously held "language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." *Francis v. Franklin*, 471 U.S. 307, 358 (1985). However, there was nothing contradictory about the combined instructions regarding other acts evidence and intent. The instructions could only be read to allow that the jury could decide by a preponderance of the evidence that Gonzales actually committed the other murders, and then could use those acts in determining intent. However, when determining intent, the charge instructed that the jury must do so beyond a reasonable doubt.

Given that juries are presumed to follow instructions, *Ortiz*, 387 F.3d at 822, and the absence of clear Supreme Court precedent invalidating a similar instruction, it was not objectively unreasonable for the Court of Appeal to find that "it was not reasonably likely the jurors believed they could find [Gonzales] guilty by a preponderance of the evidence or some standard less than beyond a reasonable doubt." (Ex. 39 at 20.)   The jury was apprised of the proper burden several times both before and after the trial court instructed the jury on "other acts" evidence.  Therefore, the Court denies Gonzales' jury instruction error claim.

### 3.       Ineffective Assistance of Counsel (Amended Claim Six).

Gonzales claims that his counsel was ineffective during trial for failing to object to the admission of evidence from a prior competency hearing and to the jury instruction that he argues lowered the burden of proof on the issue of intent.  The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To prevail on a Sixth Amendment ineffective assistance of counsel claim, Gonzales must establish two components: (1) that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms,  and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 687-88, 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.* at 694.

Gonzales' argument that he received ineffective assistance of counsel because his attorney failed to object to the State's use of the Patton Report and Dr. Burstein's testimony is without either support in the record, or merit.  Where rebuttal evidence played a small role at trial and is outweighed by overwhelming evidence of guilt, there is no prejudice under *Strickland*.  *See Mancebo v. Adams*, 435 F.3d 977, 979-980 (9th Cir. 2006).  First, Gonzales' attorney did object to admission of the challenged evidence.  (RT 2901.)  Second, given that this Court already determined that admitting the evidence was not prejudicial, it likewise would not have been prejudicial even if Gonzales' counsel entirely failed to object.  *See Mancebo*, 435 F.3d at 979-980.

1       Gonzales' argument that his counsel's failure to object to the "other acts" evidence jury

2    instruction constituted ineffective assistance also fails. A defendant is not prejudiced by his

3    counsel's failure to object to proper conduct. *See Houston v. Roe*, 177 F.3d 901, 911 (9th Cir.

4    1999). Even assuming that counsel did not object to the instructions, because this Court has

5    already decided the instructions were proper, Gonzales cannot establish that he suffered

6    prejudice. *See id.*

7       Therefore, because Gonzales cannot show prejudice from his counsel's alleged

8    deficiencies, this Court denies his ineffective assistance of counsel claim.

9                    **CONCLUSION**

10       For the foregoing reasons, Gonzales' petition for a writ of habeas corpus is DENIED.

11    **IT IS SO ORDERED.**

12

13    Dated:  September 30, 2010

                                                  _JEFFREY S. WHITE_

14                                          JEFFREY S. WHITE
                                          UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28